# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
STATE OF LOUISIANA, <u>et al.</u>,                  )
)
      Plaintiffs,                                )
)
      v.                                          )
)
)
KENNETH LEE SALAZAR,                     )
SECRETARY OF THE UNITED STATES    )
DEPARTMENT OF THE INTERIOR, <u>et al.</u>,  )    Civil Action Nos.: 11-2253 (RBW)
)                          12-253 (RBW)
      Defendants.                               )
_____

)
STATE OF ALABAMA, <u>et al.</u>,                   )
)
      Plaintiffs,                                )
)
      v.                                          )
)
)
KENNETH LEE SALAZAR,                     )
SECRETARY OF THE UNITED STATES    )
DEPARTMENT OF THE INTERIOR, <u>et al.</u>,  )
)
      Defendants.                               )
_____

## MEMORANDUM OPINION

      The plaintiffs, the state of Louisiana ("Louisiana") and the state of Alabama ("Alabama")

allege in this civil suit violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-

706 (2012), the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356b

(2012), the Submerged Lands Act ("SLA"), 43 U.S.C. §§ 1301-1315 (2012), and the federal

Debt Collection Act ("DCA"), 31 U.S.C. §§ 3701-3720E (2012), against the defendants, the

United States Department of the Interior ("DOI") and "responsible agencies and officials within

the DOI." State of Louisiana Complaint ("La. Compl.") ¶ 1; State of Alabama Complaint ("Ala. Compl.") ¶ 1. Specifically, the plaintiffs challenge the defendants' revised approach for calculating oil and gas revenues paid to coastal states along the Gulf of Mexico, resulting in alleged over-payments to certain coastal states that the defendants now seek to have returned to the federal government in some manner. La. Compl. ¶ 2; Ala. Compl. ¶ 2. Currently pending before the Court are the Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J. Mot. ") and the Defendants' Cross-Motion for Summary Judgment ("Defs.' Summ. J. Mot.").[1] Upon careful consideration of the parties' summary judgment motions,[2] as well as their oral arguments at the February 16, 2016 hearing, the Court concludes for the following reasons that it must grant in part and deny in part the parties' motions.

## I.    BACKGROUND

### A.    Statutory Background

In 1953, Congress passed the SLA, which "relinquished all federal interest in the submerged lands within three geographic miles of the coast." United Ass'n of Journeymen, Local Union No. 412 v. Barr, 981 F.2d 1269, 1270 (D.C. Cir. 1992) (citing Maryland v.

---

[1]  The Court previously permitted the states of Texas and Mississippi to intervene as a matter of right in this case. September 22, 2015 Order at 7 ("[T]he Court must permit Texas and Mississippi to intervene in this action as of right."), ECF No. 77. Both have joined in the defendants' summary judgment motion. See, e.g., Plaintiffs' Consolidated Reply to Intervenors' Supplement at 1 ("Neither Texas nor Mississippi raises new or novel arguments in this case; rather, both states merely join in the . . . [d]efendants' summary judgment arguments and adopt them as their own. Because [they] raise no new or novel arguments, [the] [p]laintiffs . . . have decided not to burden the [C]ourt with additional briefing.").

[2]  In addition to the documents previously referenced, the Court considered the following submissions in reaching its decision: (1) the Memorandum of Points and Authorities in Support of [the] Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J. Mem."); (2) the Combined Memorandum in Support of [the] Defendants' Cross-Motion for Summary Judgment and in Response to [the] Plaintiffs' Motion for Summary Judgment ("Defs.' Summ. J. Mem."); (3) the Plaintiffs' Reply in Support of Their Motion for Summary Judgment and Opposition to [the] Defendants' Cross-Motion for Summary Judgment ("Pls.' Reply"); (4) the Reply in Support of [the] Defendants' Cross-Motion for Summary Judgment ("Defs.' Reply"); (5) the Joinder of the State of Mississippi in [the] Defendant[s'] Cross-Motion for Summary Judgment and Defendant[s'] Response to [the] Plaintiffs' Motion for Summary Judgment ("Miss. Joinder"); (6) the Supplement to [the] Defendants' Cross-Motion for Summary Judgment and Opposition to the Plaintiffs' Motion for Summary Judgment ("Tex. Suppl."); and (7) the Plaintiffs' Consolidated Reply to Intervenors' Supplements ("Pls.' Reply to Miss. and Tex.").

Louisiana, 451 U.S. 725, 730 (1981)); see also Alabama v. U.S. Dep't of Interior, 84 F.3d 410,

412 (11th Cir. 1996) ("Coastal states own submerged lands adjoining their coasts extending

seaward three miles." (citing 43 U.S.C. § 1312)); Louisiana ex rel. Guste v. United States, 832

F.2d 935, 938 (5th Cir. 1987) ("In 1953, the Submerged Land[s] Act was passed giving coastal

states the right and power to manage submerged lands adjoining their respective coasts.  For

most coastal states, . . . the grant extends seaward for three miles." (citation omitted)).  The SLA

extended "the seaward boundary of a costal [s]tate . . . to a line three miles from its coastline."

Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 547 (1987).  "At that line, the [Outer

Continental Shelf] commences."[3]  Id. (citing 43 U.S.C. § 1331(a)).

Then, in a related measure later in 1953, Congress enacted the OCSLA to "address the

issue of federal authority" over the Outer Continental Shelf.  Chevron, U.S.A., Inc. v. FERC, 193

F. Supp. 2d 54, 57 (D.D.C. 2002) (footnote omitted), aff'd sub nom. Williams Cos. v. FERC,

345 F.3d 910 (D.C. Cir. 2003); see also United States v. California, 381 U.S. 139 (1965) ("In

a later measure related to the Submerged Lands Act, Congress declared that the United States

owned all submerged land in the continental shelf seaward of the lands granted to the States."

(citation omitted)); United Ass'n of Journeymen, 981 F.2d at 1270 (similar); Dr. Edward A.

Fitzgerald, The Seaweed Rebellion: The Battle over Section 8(g) Revenues, 8 J. Energy L. &

Pol'y 253, 255 (1988) ("Fitzgerald") ("One month after the enactment of the SLA, Congress

passed the [OCSLA].  The OCSLA granted the federal government jurisdiction over [Outer

Continental Shelf] lands beyond the three[-]mile limit established in the SLA." (footnote

---

[3]  The Outer Continental Shelf "is an area of submerged lands, subsoil, and seabed that lies between the outer
seaward reaches of a state's jurisdiction and that of the United States."  Ctr. for Biological Diversity v. U.S. Dep't of
Interior, 563 F.3d 466, 472 (D.C. Cir. 2009) (citing 43 U.S.C. § 1331(a)); see also Chevron, U.S.A., Inc. v. FERC
193 F. Supp. 2d 54, 57 & n.3 (D.D.C. 2002) ("submerged lands extending seaward from the navigable waters of the
United States" comprise what is "known as the Outer Continental Shelf"), aff'd sub nom. Williams Cos. v. FERC,
345 F.3d 910 (D.C. Cir. 2003).  It "generally extends from 3 miles to 200 miles off the United States coast."  Ctr. for
Biological Diversity, 563 F.3d at 472.

omitted)).  The OCSLA, inter alia, "authorize[s] federal leasing of the [Outer Continental Shelf] for oil and gas development."  Oceana v. Bureau of Ocean Energy Mgmt., 37 F. Supp. 3d 147, 150 (D.D.C. 2014) (quoting Sec'y of the Interior v. California, 464 U.S. 312, 336 (1984)).  The Secretary of the Interior ("Secretary") has primary responsibility for administering the OCSLA.  Chevron, 193 F. Supp. 2d at 57 (citing 43 U.S.C. § 1334(a)).

The revenues derived from the leasing of the Outer Continental Shelf for oil and gas development are distributed by the Secretary according to a specific framework laid out in the statute.  See 43 U.S.C. § 1337(g)(2), (g)(7).  The OCSLA provides that the Secretary

> shall deposit . . . revenues . . . derived from any lease . . . of any [f]ederal tract which lies wholly . . . within three nautical miles of the seaward boundary of any coastal [s]tate, or, . . . in the case where a [f]ederal tract lies partially within three nautical miles of the seaward boundary, a percentage of . . . revenues . . . derived from any lease . . . of such tract equal to the percentage of surface acreage of the tract that lies within such three nautical miles. . . .  [T]he Secretary shall transmit to such coastal [s]tate [twenty-seven] percent of those revenues, together with all accrued interest thereon. The remaining balance of such revenues shall be transmitted simultaneously to the miscellaneous receipts account of the . . . United States.

43 U.S.C. § 1337(g)(2).  And,

> [w]hen the Secretary leases any tract which lies wholly or partially within three miles of the seaward boundary of two or more [s]tates, the revenues from such tract shall be distributed as otherwise provided by this section, except that the [s]tate's share of such revenues that would otherwise result under this section shall be divided equally among such [s]tates.

Id. § 1337(g)(7).[4]

---

[4]  The Court, as do the parties, will refer to tracts that are leased "within three miles of a state's seaward boundary" as "8(g) tracts," as Section 8(g) of the OCSLA corresponds to Section 1337(g) of the United States code.  See, e.g., Louisiana, 832 F.2d at 938; see also Defs.' Summ. J. Mem. at 3 n.1 ("This case involves . . . a three-mile wide belt of offshore lands located (or seaward from) the coastal [s]tates' submerged lands, known as the '8(g) zone.'").  Additionally, for ease of reference, the Court will refer to 43 U.S.C. § 1337(g)(7) at times as the "revenue-sharing" provision.

B.      **Factual Background**

The following material facts underlying this litigation are not in dispute.  For many years, the defendants disbursed 8(g) oil and gas revenues to adjacent states that owned overlapping 8(g) lease tracts on the Outer Continental Shelf "in proportion to [their] respective interests in the tract," Pls.' Summ. J. Mem. at 16, i.e., the defendants "allocate[d] revenues between two coastal [s]tates at their boundaries based on the pro-rata percentage of acreage lying on each [s]tate's side of its extended lateral boarder," Defs.' Summ. J. Mem. at 14.  This "[p]roportional allocation [of revenues] was determined by 'drawing a lateral boundary line between adjacent states all the way through the 8(g) zone and sharing revenues for only those tracts intersected by this lateral boundary.'"  Pls.' Summ. J. Mem. at 16-17 (ellipses omitted) (quoting Administrative Record ("A.R.") at DOI KD 39-45); see also Defs.' Summ. J. Mem. at 20 (explaining that, in the diagram below, "lease block 862 would have been split with a majority of the [s]tate portion . . . [being] allocated to Mississippi . . . and the remainder of the [s]tate portion . . . [being] allocated to Alabama"



(alterations to diagram)).  In 2007, the defendants decided that their approach for disbursing revenues to coastal states sharing interests in the same lease tracts was inconsistent with the plain

language of 43 U.S.C. § 1337(g)(7).  See Pls.' Summ. J. Mem. at 5; Defs.' Summ. J. Mem. at 13-

15.  First, the defendants concluded that the approach "ignored the fact that a substantial amount

of leased acreage within the 8(g) zone is located well within three miles of a [s]tate's seaward

boundary despite lying on the . . . [adjacent] [s]tate's side of the extended lateral boundary."

Defs.' Summ. J. Mem. at 20; see also A.R. at DOI KD 56.  Second, they also concluded that

revenues from tracts with overlapping ownership between adjacent states were not allocated

"equally" to them.  Defs.' Summ. J. Mem. at 14; see also A.R. at DOI KD 57.  Based on these

conclusions, the defendants revised their approach.  See Pls.' Summ. J. Mem. at 17; Defs.'

Summ. J. Mem. at 20.  Instead of drawing a lateral boundary between two states that stretched

through the relevant 8(g) zone, the defendants began "[drawing] a three[-]mile arc at the point

where a lateral boundary between adjacent states intersected the SLA boundary."  Pls.' Summ. J.

Mem. at 17 (emphasis added) (quoting A.R. at DOI KD 39-45); see also Defs.' Summ. J. Mem.

at 21 ("The semicircle depicted in the image below reflects the combined results of this 'arc

methodology,' identifying the full area located 'within three miles of the seaward boundary of'

both Mississippi and Alabama.



"

(alterations to diagram)); A.R. at DOI KD 56.  Accompanying the defendants' adoption of this "arc methodology" was their decision "that, in circumstances where . . . [adjacent] [s]tates are involved, the [s]tates' share of the [leasing] revenues be split fifty-fifty."  Defs.' Summ. J. Mem. at 24; see also DOI KD at 57.

In July 2011, the defendants issued demand letters to the plaintiffs, advising them of the flawed nature of their prior approach for disbursing revenues to states that shared 8(g) tracts and seeking to recover over-payments from the plaintiffs as a result of their mistakes.  See A.R. at DOI KD 39-45; see also Defs.' Summ. J. Mem. at 15 (citing portions of administrative record indicating that notice of flaws was provided to the plaintiffs well before July 2011).  The plaintiffs then commenced this lawsuit, challenging the defendants' decision to revise their approach for disbursing oil and gas revenues under 43 U.S.C. § 1337(g), as well as the defendants' attempt to collect over-payments from the plaintiffs retroactively, dating as far back as 1986,[5] as arbitrary and capricious under the APA.  See generally La. Compl. ¶¶ 45-91; Ala. Compl. ¶¶ 35-81.  Then, in March 2013, during this litigation, the defendants issued new demand letters to the plaintiffs.[6]  See A.R. at DOI KD at 1-38.  The parties have now moved for summary judgment.[7]

---

[5] Since its passage in 1953, Congress has amended the OCSLA twice, in 1978 and 1986.  See, e.g., Louisiana, 832 F.2d 939-40; see also Fitzgerald at 256, 282.  The disputed language in 43 U.S.C. § 1337(g) was enacted in 1986.

[6] Louisiana faults the defendants for initially identifying "ambulation," i.e., the changing of a state's SLA and 8(g) boundary lines, see Pls.' Summ. J. Mem. at 15 n.8, as a reason for seeking over-payments to the state in their July 2011 demand letter, but then retracting that reason in their March 2013 demand letter, compare A.R. at DOI KD 25 (March 2013 demand letter), with id. at DOI KD 43 (July 2011 demand letter).  But, as the defendants correctly note, the plaintiffs "do not actually challenge the [defendants'] decision" to remove ambulation as a basis for collection of over-payments to the state.  Defs.' Summ. J. Mem. at 14 n.3.

[7] There are several instances where the plaintiffs suggest that the administrative record is incomplete.  See, e.g., Pls.' Summ. J. Mem. at 5 n.3, 21.  However, the Court has already rejected the plaintiffs' previous attempt to inject doubt into the sufficiency of the record.  See September 22, 2014 Order at 1 (denying motion to compel production of privilege log); see also Styrene Info. & Research Ctr., Inc. v. Sebelius, 851 F. Supp. 2d 57, 67 (D.D.C. 2012) (Walton, J.) ("Documents that are predecisional and deliberative are excluded from the administrative record

(continued . . . )

## II.     LEGAL STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In an APA case, however, the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing agency action.  See, e.g., Prof'l Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1219 (D.C. Cir. 1983).  In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.  See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).  The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Nonetheless, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Courts "will uphold a decision of less than ideal clarity if the agency's path may

---

( . . . continued)

because, under arbitrary and capricious review, the reasonableness of the agency's action 'is judged in accordance with its stated reasons." (quoting In re Subpoena Duces Tecum Served on Office of Comptroller of Currency, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998))).

reasonably be discerned." Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993)

(quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

Where agency action turns on questions of statutory interpretation, courts must utilize the

two-step process established in Chevron, U.S.A., Inc. v. Natural Resources Defense Council,

Inc., 467 U.S. 837 (1984). First, courts determine "whether Congress has directly spoken to the

precise question at issue." Id. at 842. In resolving this question, courts must exhaust the

"traditional tools of statutory construction," including textual analysis, structural analysis, and

(when appropriate) legislative history. Id. at 843 n.9. "If the intent of Congress is clear, that is

the end of the matter; for . . . court[s], as well as the agency, must give effect to the

unambiguously expressed intent of Congress." Id. at 842-43. However, if courts conclude that

the statute is silent or ambiguous on the specific issue after employing these tools, they move on

to step two and defer to the agency's interpretation, so long as it is based on a permissible

construction of the statute. See id. at 843. Indeed, "the whole point of Chevron is to leave the

discretion provided by the ambiguities of a statute with the implementing agency." Ass'n of

Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 441 (D.C. Cir. 2012) (quoting Nat'l

Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)).

Chevron deference, however, is not applicable in all situations involving agency

interpretations. It "is warranted only 'when it appears that Congress delegated authority to the

agency generally to make rules carrying the force of law, and that the agency interpretation

claiming deference was promulgated in the exercise of that authority.'" Gonzales v. Oregon, 546

U.S. 243, 255-56 (2006) (quoting United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)).

Nonetheless, precedent informs courts that "the well-reasoned views of the [agency]

implementing a statute 'constitute a body of experience and informed judgment to which courts

and litigants may properly resort for guidance.'" Bragdon v. Abbott, 524 U.S. 624, 642 (1998)

(quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)).  "The fair measure of

deference to an agency administering its own statute has been understood to vary with

circumstances, and courts have looked to the degree of the agency's care, its consistency,

formality, and relative expertness, and to the persuasiveness of the agency's position[.]"  Mead

Corp., 533 U.S. at 228 (citing Skidmore, 323 U.S. at 139-40) (footnotes omitted).  And notably

here, "substantial deference [is afforded] to the Secretary of Interior's interpretation of

ambiguous provisions in [the] OCSLA, so long as that interpretation is a 'permissible

construction of the statute.'" Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d

466, 484 (D.C. Cir. 2009) (quoting California ex rel. Brown v. Watt, 668 F.2d 1290, 1302-03

(D.C. Cir. 1981)).[8]

## III.    ANALYSIS

### A.    Whether Section 1337(g)(7) Revenues Should Be Divided Equally Or Proportionally Between Adjacent States

The plaintiffs contend that the defendants' "decision to depart from its longstanding

practice of allocating shared state 8(g) . . . [revenues] on the basis of proportional allocation is

arbitrary and capricious, and contrary to [the plain language] of [the] OCSLA."  Pls.' Summ. J.

Mem. at 19.  They submit that the plain language of Section 1337(g)(7), specifically the term

"divided equally," imports the concept of proportional allocation from Section § 1337(g)(2) to

Section 1337(g)(7).  Pls.' Summ. J. Mem. at 22; see also Pls.' Reply at 3-5.  The plaintiffs'

_____

[8]  "In light of these standards, th[e] Court has focused its analysis on the persuasiveness of the [defendants']
statutory interpretation—without regard to whether . . . [their] determination is entitled to Chevron deference under
the circumstances presented here."  R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric., _ F. Supp. 3d _, _, 2015 WL
5464882, at *13 (D.D.C. 2015).  The Court's conclusion below that the defendants have interpreted the revenue-
sharing provision reasonably when viewed through a less deferential lens than Chevron, renders it unnecessary to
resolve the parties' disagreement over whether Chevron deference is warranted here.  See id.

reading of the statutory language is strained at best, and thus, the Court is persuaded that the defendants have the better interpretation on this point.

As an initial matter, Section 1337(g)(2) and Section 1337(g)(7) discuss revenue sharing in <u>different</u> contexts.  Section 1337(g)(2) contemplates revenue sharing between one coastal state and the federal government, whereas Section 1337(g)(7) contemplates revenue sharing among multiple states, as well as between those states and the federal government.  More importantly, the plaintiffs' construction of Section 1337(g)(7) would read an entire clause out of that provision, rendering the term "divided equally" meaningless, and thus, their construction cannot be correct.  <u>See, e.g.</u>, <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001))).  In its entirety, the revenue-sharing provision reads:

> [w]hen the Secretary leases any tract which lies wholly or partially within three miles of the seaward boundary of two or more [s]tates, the revenues from such tract shall be distributed as otherwise provided by this section [(i.e., 43 U.S.C. § 1337(g)(2))], <u>except</u> that the [s]tate's share of such revenues <u>that would otherwise result under this section</u> shall be <u>divided equally among such [s]tates.</u>

43 U.S.C. § 1337(g)(7) (emphasis added).  As drafted, the "except" clause limits the preceding clause that contains the term "as otherwise provided by this section."  As the defendants correctly note, the limitation means that "although revenues shall generally be distributed as called for elsewhere in the section ([i.e.,] such as [the] split [of] 73% to the federal government and 27% to the [s]tates . . . [under Section 1337(g)(2)]), . . . the revenues [that] are to be divided between the relevant[,] [adjacent] [s]tates [are] governed by the express language of the limiting

clause[,]"; in other words, the revenues are to be "divided equally" between those states.  Defs.'

Summ. J. Mem. at 25 (quoting 43 U.S.C. § 1337(g)(7)).

The fact that the defendants had differing interpretations among themselves of the

revenue-sharing provision before settling on its current interpretation, see Pls.' Summ. J. Mem.

at 19-24; Pls.' Reply at 4-5, does not demonstrate that their ultimate interpretations are arbitrary

and capricious, see, e.g., Cumberland Pharm. Inc., v. FDA, 981 F. Supp. 2d 38, 52 (D.D.C. 2013)

(Walton, J.) ("[D]isagreement among agency staff during the decisionmaking process does not

fatally undermine the agency's final determination, nor does it alone justify according the

agency's final decision less deference than usual."); Graceway Pharm., Inc. v. Sebelius, 783 F.

Supp. 2d 104, 113-15 (D.D.C. 2011) (Walton, J.) (recognizing that "internal disagreement

between the different divisions of . . . [an agency] is certainly not . . . dispositive proof of

arbitrary and capricious action," and if anything, consideration of differing opinions is indicative

that the agency did not violate APA); Fund for Animals v. Hall, 777 F. Supp. 2d 92, 109 (D.D.C.

2011) ("disagreement among employees does not make an agency's decision arbitrary or

capricious" (quoting Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58, 64 (4th Cir.1991))).

Instead, it reflects reasoned decisionmaking that has led the defendants to implement the

revenue-sharing provision as prescribed and envisioned by Congress.[9]  See Graceway Pharm.,

---

[9]  To the extent there is any ambiguity in the revenue-sharing provision—but the Court sees none—the Court is
persuaded that the defendants have adopted a reasonable construction of the term "divided equally," as it is
consistent with the plain language, legislative history, and purpose of the OCSLA.  See, e.g., 131 Cong. Rec. 18201-
01 (1985) ("Paragraph (7) applies to the situation where [f]ederal leases lie wholly or partially within three miles of
the seaward boundary of [two] or more States.  There are [f]ederal tracts in the Sabine Pass between . . . Texas and
Louisiana which fall in this category.  Under this provision[,] Texas and Louisiana will each receive 13 1/2 % of the
8(g) revenues from these tracts . . . ." (emphasis added)).

Further, although the defendants' interpretation can produce odd results, see Pls.' Summ. J. Mem. at 22
("[E]ven where 99% of a lease tract lies within the 8(g) zone of one state and the remaining 1% of the tract lies
within the 8(g) zone of another state, the shared revenues associated with that tract must be shared [equally]."), there
is no indication that Congress did not intend for these oddities, see, e.g., Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075,
1088-89 (D.C. Cir. 1996) ("[T]here must be evidence that Congress meant something other than what it literally said
(continued . . . )

783 F. Supp. 2d at 113-15; see also A.R. at DOI KD 53-57, 836, 1661, 4034-40 (consideration and discussion among defendants regarding proper legal interpretation of revenue-sharing provision).[10]

### B.     Whether The Decision To Use The "Arc Methodology" Violated The APA

There can be no dispute that the plain language of the OCSLA does not address the precise methodology for identifying the exact contours of any 8(g)(7) lease tract that is no more than "three miles of the seaward boundary" of a state. 43 U.S.C. § 1337(g)(7). Accordingly, the Court assesses whether the "arc methodology" now employed by the defendants is a persuasive interpretation of the pertinent statutory provision. It is. The "arc methodology" is reasonable, as the defendants have explained how it comports with the plain language of the OCSLA revenue-sharing provision—the methodology identifies all, as opposed to some, lease tracts that are within three miles of a coastal state[11]—and is consistent with the legislative history and purpose of the OCSLA.[12] See Distribution of Section 8(g) Revenues to States: Hearing Before the

_____

(. . . continued)

before a court can depart from plain meaning. In the absence of such evidence, the court cannot ignore the text by assuming that if the statute seems odd to us, i.e., the statute is not as we would have predicted beforehand that Congress would write it, it could be the product only of oversight, imprecision, or drafting error."); see also 131 Cong. Rec. 18201-01 (indicating that under Section 8(g)(7), two states would "each receive 13 1/2 % of the 8(g) revenues" for shared lease tracts (emphasis added)).

[10] These portions, among others, of the administrative record demonstrate that the prevailing statutory interpretation was a result of reconsideration of the plain language of the statute and recognition that the prior interpretation was incorrect. And thus, the plaintiffs cannot claim that they are in the dark as to why the internal debate among the defendants led to the new statutory interpretation.

[11] The defendants made an apt analogy during oral argument. As they noted, were the Court to bar individuals from coming within three miles of the courthouse, it would draw a circle with a three-mile radius from a particular point in the courthouse to establish the three-mile boundary.

[12] The plaintiffs contest the application of the "arc methodology" with respect to the eastern edge of Texas that extends beyond Louisiana and into the Gulf of Mexico, resulting in what the parties refer to as the "Texas wrap-around." See Pls.' Summ. J. Mem. at 24-28 (challenging defendants' "restoration" of the "Texas wrap-around"). But in this APA case, the plaintiffs must establish both constitutional and prudential standing in order to contest this application. Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998) ("[T]he APA . . . impose[s] a prudential standing requirement in addition to the requirement, imposed by Article III of the

(continued . . . )

Subcomm. On Panama Canal/Outer Continental Shelf, 99th Cong. 41, 81-82, 90 (1985) ("1985 Subcomm. Hr'g") (testimony regarding proposed revenue-sharing provision that included illustration demonstrating that "arc methodology" should be employed to identify all lease tracts that fall within three miles from the state[13]); see also United States v. Alaska, 521 U.S. 1, 8-9 (1997) (recognizing in SLA case that "arc methodology" can be used to identify "every point of which is . . . [a certain number of] miles from" a particular point on state's coastline).

Notably, the plaintiffs do not appear to muster a challenge to the reasonableness of the defendants' use of the "arc methodology" to identify the full scope of a leasing tract that is within three miles of a state's seaward boundary.  Thus, the plaintiffs implicitly acknowledge that the defendants' "arc methodology" is a reasonable interpretation of the revenue-sharing provision.  See Pls.' Summ. J. Mem. at 18 (recognizing that "three-mile arc concept . . . might be the preferred method"); see also Pls.' Summ. J. Reply at 6-7 (conceding that the "arc methodology" is a "reasonable construction of the statute," but that even a reasonable reinterpretation of a statute must "provide an opportunity for public notice and comment").

---

( . . . continued)
Constitution, that a plaintiff have suffered a sufficient injury in fact.").  Neither Alabama nor Louisiana have overcome the mandatory, constitutional hurdle.  There is no dispute that Alabama does not have standing because it "lacks any geographic or monetary claim" with respect to the "Texas wrap-around" area. Defs.' Summ. J. Mem. at 27-28.  And Louisiana concedes that it stands to benefit from this application of the "arc methodology," see Pls.' Summ. J. Mem. at 27 n.14, so it cannot have standing merely because it has been "affect[ed]" by its application, Pls.' Reply at 8 n.4—rather, it must suffer a financial injury, see, e.g., KERM, Inc. v. FCC, 353 F.3d 57, 60-61 (D.C. Cir. 2004) (no standing where there was no "concrete showing that [the plaintiff] is in fact likely to suffer financial injury as a result of the challenged [agency] action"); West Virginia v. U.S. Dep't of Health & Human Servs., _ F. Supp. 3d _, _, 2015 WL 6673703, at *4 (D.D.C. 2015) ("[The plaintiff] does not claim that the [agency action] has caused it to suffer any financial injury." (citations omitted)).

[13]  The plaintiffs have misread the testimony.  See Pls.' Reply at 5.  The testimony concerning "proportional" disbursement of leasing revenues was only relevant to those situations where "roughly half of the . . . [leasing] tract [was] inside the 8(g) zone and [the other] half of it [was] outside the 8(g) zone," 1985 Subcomm. Hr'g at 82, that is, situations where one state and the federal government have a shared interest in a tract, see id. at 90 (illustration accompanying testimony).

The plaintiffs' complaint is that the defendants' decision to change their mapping methodology "was made in the absence of any reasoned explanation . . . ." Pls.' Summ. J. Mem. at 16. But the administrative record demonstrates otherwise. "[T]he law is clear that 'an . . . agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding.'" Firearms Imp./Exp. Roundtable Trade Grp. v. Jones, 854 F. Supp. 2d 1, 18 (D.D.C. 2012) (one alteration omitted) (quoting Chisholm v. FCC, 538 F.2d 349, 364 (D.C. Cir. 1976)), aff'd sub nom. Firearms Imp./Exp. Roundtable Trade Grp. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 498 F. App'x 50 (D.C. Cir. 2013). When the "agency . . . change[s] its mind about the proper interpretation of a statute," it must "provide[] a rational explanation for the change." Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior, _ F. Supp. 3d _, _, 2015 WL 7176104, at *22 (D.D.C. 2015) (citing Inv. Co. Inst. v. Commodity Futures Trading Comm'n, 720 F.3d 370, 377 (D.C. Cir. 2013)); see also Inv. Co. Inst., 720 F.3d at 376 ("An agency changing course 'need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better.'" (quoting FCC, 556 U.S. at 515)). The "agency faces a 'low bar' in justifying a change in" statutory interpretation. Otay Mesa Prop., _ F. Supp. 3d at _, 2015 WL 7176104, at *22 (quoting Inv. Co. Inst., 720 F.3d at 377). And "an agency's interpretation of a statute is entitled to no less deference . . . simply because it has changed over time." Alabama Educ. Ass'n v. Chao, 455 F.3d 386, 396 (D.C. Cir. 2006). Instead, "the question . . . is whether the [agency] has supported its new reading of [the statute] with a 'reasoned analysis' sufficient to command . . . deference under Chevron." Id.

Here, the defendants have cleared the "low bar" necessary to justify its revised statutory interpretation.[14]  On multiple occasions, the defendants notified the plaintiffs that they had disbursed "excess revenue[s]" to the plaintiffs, explaining that the disbursements were the "result[] . . . [of] clerical and methodological errors used to disburse . . . revenues under . . . [43 U.S.C. § 1337(g)]."  A.R. at DOI KD 1, 24; see also id. at DOI KD 39, 43 (similar).  More specifically, the defendants informed the plaintiffs that

> [i]n accordance with . . . [the OCSLA], when the Secretary leases any tract that lies wholly or partially within three miles of the seaward boundary of two or more states, the revenues from such tract must be divided equally among such states. . . .  In the past, . . . [the defendants] incorrectly shared revenue for only those lease tracts that were intersected by a line derived by extending the . . . lateral boundary line between adjacent states through the 8(g) zone.  The [defendants] incorrectly apportioned revenue from the intersected lease tracts in proportion to the acreage of each lease tract that fell on each state's side of that line.

Id. at DOI KD 2, 25; see also id. at DOI KD 39, 42 (similar); id. at DOI KD 53-57, 836, 1661, 4034-40.  And they also explained that

> [t]o determine when a tract lies wholly or partially within three miles of the seaward boundary of two or more states, [the defendants] must draw a three[-

---

[14]  The plaintiffs' argument that the defendants have never explained their change in methodology is somewhat belied by their own reading of the administrative record, see Pls.' Summ. J. Mem. at 18 (acknowledging that the Office of the Solicitor for the Department of Interior ("Solicitor Office") "instructed" that the "arc methodology" be used, but failing to read this instruction in the context of the full administrative record, which demonstrates that the recommended and adopted "arc methodology" was more consistent with the plain language of the revenue-sharing provision); id. at 21 (discerning from the administrative record that the defendants adopted the Solicitor Office's "reading of [43 U.S.C. § 1337(g)(7)]" and its "position" that the revenue-sharing provision "mandates that 27% of all the revenues for a lease with shared 8(g) acreage must be allocated 50/50 among the involved states" (quoting DOI KD 3471)), which demonstrates that the defendants revised their methodology because it was inconsistent with the mandates of the OCSLA, see A.R. at DOI KD 1-2, 24-25, 39-40, 43-44, 53-57, 836, 1661, 4034-40; see also Bowman Transp., 419 U.S. at 285-86 ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (citations omitted)).

Moreover, the plaintiffs' citation to a 2006 Federal Register notice is unavailing.  See Pls.' Summ. J. Mem. at 19.  The notice does not concern how the defendants determine the scope of an area that is within "three miles of the seaward boundary" of a state for purposes of calculating revenue under 43 U.S.C. § 1337(g)(7).  And even under the assumption that this notice prescribed a method for identifying tracts that are within "three miles of the seaward boundary" of a state, as the Court has just explained, the law does not prevent the defendants from changing their methodology, so long as they give a reasonable explanation for doing so.

]mile arc at the point where a lateral boundary between adjacent states intersects the SLA boundary.  Revenues from those lease tracts intersected by the arcs of more than one state must be shared equally between the affected states.

Id. at DOI KD 2, 25; see also id. at DOI KD 39-40, 43-44 (similar); id. at DOI KD 53-57, 836, 1661, 4034-40.  In sum, the defendants' persuasive force is strong, as their interpretation of the revenue-sharing provision is consistent with its plain language, legislative history, and the purpose of the OSCLA.  The Court must, therefore, reject the notion that the defendants' interpretation of the revenue-sharing provision is arbitrary, capricious, or otherwise contrary to law.

### C.        Whether The Defendants' Actions Were Subject To Notice And Comment

The plaintiffs argue that the defendants' "decision to change [their] interpretation" of Section 1337(g)(7) "without affording interested parties an opportunity for notice and comment violates the APA."  Pls.' Summ. J. Mem. at 10.  The notice-and-comment requirements of the APA, however, were not an obstacle to the issuance of the defendants' demand letters.

"The distinction between those agency pronouncements subject to APA notice-and-comment requirements and those that are exempt has been aptly described as 'enshrouded in considerable smog[.]'"  Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1108-09 (D.C. Cir. 1993) (quoting Gen. Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984)).  "Legislative rules (also called 'substantive rules') are subject to the APA's notice-and-comment requirements."  Mountain States Health All. v. Burwell, _ F. Supp. 3d _, _, 2015 WL 5297498, at *7 (D.D.C. 2015) (citing 5 U.S.C. § 553).  This is because they "grant rights, impose obligations, or produce other significant effects on private interests."  Batterton v. Marshall, 648 F.2d 694, 701-02 (D.C. Cir. 1980).  "Interpretative rules," on the other hand, are not subject to notice-and-comment requirements.  Mountain States, _ F. Supp. 3d at _, 2015 WL

5297498, at *7.  The reason for this distinction is because interpretative rules merely "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track' preexisting requirements and explain something the statute or regulation already required," Mendoza v. Perez, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (alteration omitted) (quoting Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan, 979 F.2d 227, 236–37 (D.C. Cir. 1992)); see also Perez v. Mortgage Bankers Ass'n, _ U.S. _, _, 135 S. Ct. 1199, 1204 (2015) ("critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers'" (quoting Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995))); Gen. Motors Corp., 742 F.2d at 1565 (agency action determined to be interpretative rule where it was explicitly based upon an analysis of the meaning of the statute).  Moreover, interpretative rules "derive a proposition from an existing document whose meaning compels or logically justifies the proposition," Catholic Health Initiatives v. Sebelius, 617 F.3d 490, 494 (D.C. Cir. 2010).

The District of Columbia Circuit has considered several factors in assessing whether a rule is legislative or interpretative.  See Am. Mining Cong., 995 F.2d at 1112.  These factors include:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule.

Id. at 1112.  An affirmative answer to any one of these four factors renders the rule legislative. See id.

None of these factors are present here.  The defendants' did not publish their revised approach for disbursing revenues pursuant to Section 1337(g)(7) in the Code of Federal

Regulations, did not explicitly invoke their general rulemaking authority in developing their revised methodology, and did not effectively amend any prior legislative rule.  See Defs.' Summ. J. Mem. at 32.  Their new approach did nothing more than "interpret a statutory . . . term," which is "the quintessential example of an interpretive rule."  Orengo Caraballo v. Reich, 11 F.3d 186, 195 (D.C. Cir. 1993); see also id. ("[A]n interpretive statement may 'supply crisper and more detailed lines than the authority being interpreted' without losing its exemption from notice and comment requirements under [the APA]."  (quoting Am. Mining Cong., 995 F.2d at 1112)). More specifically, the defendants have merely amended their interpretation of Section 1337(g)(7), thereby changing how they enforce this revenue-sharing provision of the OCSLA. See, e.g., Pls.' Summ. J. Mem. at 10 (accusing defendants of violating the APA notice-and-comment requirements because they "change[d] [their] interpretation of the . . . [OCSLA]"); Pls.' Reply at 12 (similar); see also Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta, 785 F.3d 710, 713 (D.C. Cir. 2015) ("As Perez makes clear, the APA 'permits agencies to promulgate freely interpretive rules—whether or not they are consistent with earlier interpretations'" (alteration omitted) (quoting Perez, _ U.S. at _, S. Ct. at 1207)); Am. Mining Cong., 995 F.2d at 1111-12 ("Where a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation evolve ad hoc in the process of enforcement . . . ."); Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 424-25 (D.D.C. 2014) (agency action determined to be interpretative rule where agency "[did] not stray far from the [statutory] provision's text").[15] And while the revised interpretation of the statutory provision affects the plaintiffs' rights, that

---

[15]  The Court finds Securities Industries and Financial Markets helpful.  There, like here, the challenged agency action was deemed interpretative conduct because the agency did no more than analyze a provision of a relevant statute in the case.  See 67 F. Supp. 3d at 424-25.

alone is insufficient to trigger the APA's notice-and-comment requirements.[16]  See Fertilizer

Inst. v. U.S. EPA, 935 F.2d 1303, 1308 (D.C. Cir. 1991) ("To the contrary, as we reasoned in

United Techs. Corp. v. EPA, 821 F.2d 714, 719-20 (D.C. Cir. 1987), the proper focus in

determining whether an agency's act is legislative is the source of the agency's action, not the

implications of that action:  If the rule is based on specific statutory provisions, it is an

interpretative rule.  If, however, the rule is based on an agency's power to exercise its judgment

as to how best to implement a general statutory mandate, the rule is likely a legislative one."

(ellipses omitted)).  No new rights or obligations were created by the defendants beyond what

was already in the OCSLA.  See Citizens to Save Spencer Cty. v. U.S. EPA, 600 F.2d 844, 876

(D.C. Cir. 1979) (interpretative rule is "merely an agency's interpretation of a statute it is

charged with implementing and create no law and have no effect beyond that of the statute").

        The plaintiffs are of the mistaken impression that any time "[a]gencies . . . change their

interpretation of a statute, . . . they must comply with . . . notice[-]and[-]comment requirements."

Pls.' Summ. J. Mem. at 10 (citing Nat'l Cable, 545 U.S. at 986); see also Pls.' Summ. J. Reply at

6-7 (any reinterpretation of a statute must be subjected to the APA's notice-and-comment

requirements).  First, their reliance on National Cable is misplaced, as it has no bearing on the

plaintiff's proposition.  Second, such a sweeping proposition has been rejected.  See Huerta, 785

F.3d at 713 ("Not all 'rules' must be issued through the notice-and-comment process. . . . [T]he

APA provides that, unless another statute states otherwise, the notice-and-comment requirement

'does not apply' to 'interpretative rules, general statements of policy, or rules of agency

organization, procedure, or practice.'"  (quoting Perez, _ U.S. at _, S. Ct. at 1203-04)); Halifax

---

[16]  City of Idaho Falls v. FERC, 629 F.3d 222 (D.C. Cir. 2011), and Appalachian Power Co. v. EPA, 208 F.3d 1015
(D.C. Cir. 2000), provide no assistance to the plaintiffs.  See Pls.' Summ. J. Mem. at 10-12.  Unlike those cases, the
Court has found that the defendants here have not created new substantive rights or obligations absent from the text
of the OCSLA.

Mem'l Hosp. v. Sullivan, No. 92-0154, 1993 WL 170954, at *8 (D.D.C. Mar. 31, 1993) ("[The]

[p]laintiff is suggesting that notice-and-comment procedures would be required whenever an

agency sets out to interpret a statute or regulation, to ensure the reasonableness of its

interpretation.  The fact is, however, that the APA does not require as much: the statute

establishes certain exceptions to the notice-and-comment procedure." (footnote omitted)).  As

the Court has concluded above, the defendants' change in approach at most reflects a change in

an interpretative rule, which is exempt from the strictures of notice-and-comment under the

APA.[17]

### D.    Whether The Defendants Have Authority To Demand Payment

The plaintiffs insist that the defendants' demand to have them "return millions of dollars

[is] contrary to the APA and the DCA."  Pls.' Summ. J. Mem. at 28; see also A.R. at DOI KD 2,

25, 40, 44.  They claim that they owe neither a "debt" nor a "claim" to the defendants as defined

by the DCA.  Id. at 29-31.  The plaintiffs' position cannot be squared with the plain language of

the DCA.

The DCA permits the defendants "to collect a claim . . . for money or property arising out

of the activities of, or referred to, the agency . . . ."  31 U.S.C. § 3711(a)(1).  A "claim" means

"any amount of funds or property that has been determined by an appropriate official of the

---

[17]  The defendants' application of the revised approach is not impermissibly retroactive as suggested by the plaintiffs.  See Pls.' Reply at 14-15; Pls.' Summ. J. Mem. at 41-44.  The defendants are merely correcting their interpretation of an existing law.  See, e.g., Sentara-Hampton Gen. Hosp. v. Sullivan, 980 F.2d 749, 759-60 (D.C. Cir. 1992) (application of the agency interpretive rule did not amount to "retroactive application of substantive law"); Amisub v. Shalala, No. 94-cv-1883(TFH), 1995 WL 798910, at *7-8 (D.D.C. Dec. 4, 1995) (similar); cf. Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue, 297 U.S. 129, 135 (1936) ("The contention that the new regulation is retroactive is without merit.  Since the original regulation could not be applied, the amended regulation in effect became the primary and controlling rule in respect of the situation presented.  It pointed the way, for the first time, for correctly applying the antecedent statute to a situation which arose under the statute.  The statute defines the rights of the taxpayer and fixes a standard by which such rights are to be measured.  The regulation constitutes only a step in the administrative process.  It does not, and could not, alter the statute.  It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." (citation omitted)).

[f]ederal [g]overnment to be owed to the United States . . . ."  Id. § 3701(b)(1).[18]  A "claim

includes[] without limitation[,] . . . over-payments . . . ."  Id. § 3701(b)(1)(C).[19]  Simply put,

the DCA authorizes the defendants to collect their over-payments to the plaintiffs.[20]  See, e.g.,

Old Republic Ins. Co. v. Fed. Crop Ins. Corp., 947 F.2d 269, 275 (7th Cir. 1991) (recognizing

that the DCA authorized agency to collect funds that were "overpaid" to an entity).

In seeking to collect on a claim, the defendants must undoubtedly comply with the law.

One means of collecting on a claim is through an administrative offset.  31 U.S.C. § 3716(a).  An

"administrative offset" occurs where there is a "withholding [of] funds payable by the United

States . . .  to, or held by the United States for, a person to satisfy a claim."  Id. § 3701(a)(1).  To

collect a claim through an administrative offset, there must be:

---

[18]  The plaintiffs suggest that no "appropriate federal official" has determined that the defendants are owed any funds from the plaintiffs.  See Pls.' Summ. J. Mem. at 33-34.  This suggestions falls flat in light of the administrative record.  See A.R. at DOI KD 1-2, 24-25, 39-40, 43-44 (identifying divisions at the Department of Interior that made decision to demand return of over-payments to the plaintiffs, such as the Office of Natural Resource Revenue); id. at DOI KD at 53-58; see also Native Vill. of Point Hope v. Salazar, 680 F.3d 1123, 1126 n.2, 1128 n.4 (9th Cir. 2012) (explaining that in OCSLA case "[t]he Office of Natural Resource Revenue [is] . . . responsible for revenue collection"); Defs.' Summ. J. Mem. at 39-40 & nn. 12-13 (explaining Department of Interior hierarchy pertinent to administration of the OCSLA).

[19]  The plaintiffs are correct that the DCA does not create a right of recovery for the over-payments.  See Pls.' Summ. J. Mem. at 30-31; see also Spectrum Leasing Corp. v. United States, 764 F.2d 891, 894 (D.C. Cir. 1985).  And consistent with the plaintiffs' understanding of the statute, the defendants are relying on the OCSLA as "[t]he source of substantive authority to recover" the over-payments to the plaintiffs.  Defs.' Summ. J. Mem. at 38; see also A.R. at DOI KD 1-2, 24-25, 39-40, 43-44 (explaining that correct interpretation of the OCSLA reveals that plaintiffs were overpaid).

[20]  The plaintiffs quibble with the defendants' failure to use the precise term "over-payments" in any of its correspondence with the plaintiffs addressing excess disbursements and the DCA.  See Pls.' Reply at 16 & n.8.  But the correspondence clearly indicates that the defendants were seeking the return of funds that were overpaid to the plaintiffs.  See A.R. at DOI KD 2, 25, 40, 44 (demanding return of certain amount of money because they were "excess . . . revenue disbursements," i.e., over-payments, and citing the DCA); Pub. Citizen, 988 F.2d at 197 ("Courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting Bowman Transp., 419 U.S. at 286)).

Further, the plaintiffs' contention that the defendants must comply with the statute of limitations laid out in the Federal Oil and Gas Royalty Management Act ("FOGRMA"), 30 U.S.C. §§ 1701-1759 (2012), is meritless.  See Pls.' Reply 20-21; Pls.' Summ. J. Mem. at 39-40. That statute has no relevance to this case, as it concerns the federal government's handling of funds that are owed to it by lessees of federal oil and gas leases.  See 30 U.S.C. § 1701(a)-(b).  It does not govern the subsequent redistribution of those funds between the states and the federal government.  See id. § 1731a (noting that 43 U.S.C. § 1337(g) concerns the entitlement of coastal states to receive the revenues from the leases).

> (1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;
> (2) an opportunity to inspect and copy the records of the agency related to the claim;
> (3) an opportunity for a review within the agency of the decision of the agency related to the claim; and
> (4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

Id. § 3716 (b)(1)-(4); see also 31 C.F.R. § 901.2(b) (2015) ("Demand letters shall inform the debtor of: (1) [t]he basis for the indebtedness and the rights, if any, the debtor may have to seek review within the agency; (2) [t]he applicable standards for imposing any interest, penalties, or administrative costs; (3) [t]he date by which payment should be made to avoid late charges (i.e. interest, penalties, and administrative costs) and enforced collection, which generally should not be more than 30 days from the date that the demand letter is mailed or hand-delivered; and (4) [t]he name, address, and phone number of a contact person or office within the agency.").

To be sure, the defendants here are seeking to collect their over-payments through an administrative offset. See A.R. at DOI KD 2-3, 25 ("In the absence of payment or an acceptable repayment arrangement, [the defendants] may recover the amount incorrectly paid to the [s]tate through recoupment against future monthly disbursements to the [s]tate . . . . [W]e propose a recoupment plan that would reduce future monthly disbursements to the [s]tate under [43 U.S.C. § 1337(g)] by [50%] until the excess disbursements have been recovered."); see also id. at DOI KD 40, 45. And they insist that their demand letters comply with the DCA. See Defs.' Reply at 16 n.9 ("The only purpose of the citation was to observe that, even if [the] [p]laintiffs were correct in their argument that technical formalities of the DCA were not satisfied by the [d]emand [l]etters (and they are not correct), this would in no way diminish the fact that [the] [p]laintiffs owe a debt to the United States that must be collected. Any asserted rights to further

process regarding the underlying debt are more than satisfied through this litigation.").  Yet, the

demand letters tell a different story.  Nowhere in the demand letters do the defendants afford the

plaintiffs an opportunity "to inspect and copy the [defendants'] records . . .  related to the claim"

or an opportunity for "review" of the defendants' decision.  31 U.S.C. § 3716 (b)(2)-(3); see also

31 C.F.R. § 901.2(b) ("Demand letters shall inform the debtor of . . . the rights, if any, the debtor

may have to seek review within the agency . . . .").  Therefore, the process by which the

defendants intend to collect the over-payments does not comport with the requirements of the

DCA.  Accordingly, the case is remanded to the agency for further agency action consistent with

the requirements of the DCA, or any other legal authority the defendants intend to employ to

collect the over-payments.[21]

## IV.    CONCLUSION

In conclusion, the defendants have not violated the APA by revising their approach to

disbursing oil and gas revenues to states under the OCSLA, which resulted in excess

disbursements to the plaintiffs.  However, because the manner in which the defendants intend to

recoup these disbursements is not in conformity with the DCA, they cannot do so at this time.

---

[21]  As just noted, the defendants maintain that "[a]ny asserted rights to further process regarding" the over-payments "are more than satisfied through this litigation." Defs.' Reply at 16.  But they cite no authority that permits an agency to correct administrative deficiencies through litigation in court.  See, e.g., Envtl. Def. Fund v. Reilly, 909 F.2d 1497, 1506 (D.C. Cir. 1990) ("[S]hould a district court on APA review find agency action defective, either substantively or procedurally, it ordinarily must remand to the agency for further proceedings." (citations omitted)).

And the Court will not assess whether there is a common law right to collect the over-payments.  See Defs.' Summ. J. Mem. at 41.  None of the defendants' demand letters ever identified any such authority as a basis for collecting the over-payments.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for . . . [agency] deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))).

The Court must, therefore, remand the case to the defendants to ensure that the plaintiffs are afforded their procedural rights under the DCA.[22]

**SO ORDERED** this 15th day of March, 2016.[23]

REGGIE B. WALTON
United States District Judge

---

[22]  Notwithstanding this Memorandum Opinion, it would seem wise for the defendants, out of an abundance of caution, to address all the alleged deficiencies advanced by the plaintiffs in any future summary judgment briefings. Moreover, as the Court indicated during oral argument, a reasonable settlement that reduces the need for further intervention from the Court should be explored upon remand.

[23]  The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.